08 CV 8057

JUDGE MARRERO

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| AIMIS ART CORPORATION and All Others Similarly Situated,<br>　　　　　　Plaintiff,<br><br>v.<br><br>NORTHERN TRUST SECURITIES, INC., NORTHERN TRUST CORPORATION, and NORTHERN TRUST COMPANY,<br><br>　　　　　　Defendants. | CIVIL ACTION NO. _____<br><br>**CLASS ACTION COMPLAINT FOR VIOLATIONS OF FEDERAL SECURITIES LAWS**<br><br><u>JURY TRIAL DEMANDED</u> |

## INTRODUCTION

1. This is a class action under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") on behalf of all persons or entities which purchased auction rate securities (also known as auction rate preferred stock, auction market preferred stock, variable rate preferred securities, money market preferred securities, periodic auction rate securities and auction rate bonds) from Northern Trust between September 16, 2003 and February 13, 2008, inclusive (the "Class Period").

2. Northern Trust represented to investors that their accounts were equivalent to cash or money market funds; were highly liquid, safe investments for short-term investing; and that the cash would be available in a matter of days.

3. Defendants knew, but failed to disclose to investors, material facts about auction rate securities. In particular, Defendants knew, but failed to disclose that these auction rate securities were not cash alternatives, but were instead, complex, long-term financial instruments with 30 year maturity dates, or longer.

4. On February 13, 2008, 87% of all auctions of auction rate securities failed when major broker-dealers refused to continue to support the auctions. As a result of the withdrawal

1

of support by all of the major broker-dealers, the market for auction rate securities collapsed, leaving the holders of more than $300 billion in auction rate securities with no means of liquidating investments Defendants offered as a suitable alternative to money market funds and other short term cash management vehicles.

## JURISDICTION AND VENUE

5. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1337, and Section 27 of the Exchange Act (15 U.S.C. § 78aa). The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)), and Rule 10b-5 promulgated thereunder by the Securities Exchange Commission ("SEC") (17 C.F.R. 240.10b-5).

6. Venue is proper in this District pursuant to Section 27 of the Exchange Act and 28 U.S.C. § 1391(b), § 1337. Defendants regularly conduct business within this District and many of the acts giving rise to the violations complained of herein took place in this District.

7. In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce including, but not limited to, the mails, interstate telephone communications and the facilities of the national securities markets.

## PARTIES

8. Plaintiff Aimis Art Corporation purchased auction rate securities from Northern Trust in August 2007 and continued to hold such auction rate securities as of February 13, 2008.

9. Defendant Northern Trust Corporation (the "Corporation" or "NTC") is a Delaware corporation headquartered in Chicago, Illinois. NTC describes itself as "a financial holding company that is a leading provider of investment management, asset and fund administration, fiduciary, and banking solutions for corporations, institutions, and affluent individuals."

10. Defendant Northern Trust Securities, Inc. ("NTS") is a Delaware corporation, a member of the Financial Industry Regulatory Authority ("FINRA"), and a wholly-owned

subsidiary of Northern Trust Corporation. NTS is registered with the SEC as a broker-dealer pursuant to Section 15(b) of the Exchange Act.

11.    Defendant Northern Trust Company (the "Bank") is an Illinois banking corporation headquartered in Chicago and is NTC's principal subsidiary.

12.    Unless specifically noted, "Northern Trust" and "Defendants" refers collectively to NTC, NTS and the Bank.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

13.    Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all persons and entities who purchased auction rate securities from Northern Trust between September 16, 2003 and February 13, 2008, inclusive, and continued to hold such accounts and auction rate securities as of February 13, 2008 (the "Class"). Excluded from the Class are Defendants, the officers and directors of any defendant, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which any defendant has or had a controlling interest.

14.    The members of the Class are so numerous that joinder of all members is impracticable. The market for auction rate securities, while it existed, was estimated to exceed $300 billion in the United States and Northern Trust was a significant seller of auction rate securities while the market for such securities existed. While the exact number of Class members is unknown to plaintiff at this time and can only be ascertained through appropriate discovery, plaintiff believes that there are thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by Defendants and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

15.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a) Whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b) Whether statements made by Defendants to the investing public during the Class Period misrepresented or omitted material facts about the liquidity of and risks associated with auction rate securities and the market for such securities; and

(c) To what extent the members of the Class have sustained damages and the proper measure of damages.

16. Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

17. Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

18. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

19. In the alternative, the Class may be certified under the provisions of Fed. R. Civ. P. 23(b)(1) and/or 23(b)(2) because: (a) the prosecution of separate actions by individual Class members, would create a risk of inconsistent or varying adjudications with respect to individual Class members which would establish incompatible standards of conduct for Defendants; (b) the prosecution of separate actions by individual Class members would create a risk of adjudications with respect to them which would, as a practical matter, be dispositive of the interests of other Class members not parties to the adjudications, or substantially impair or impede their ability to protect their interests; and (c) Defendants have acted or refused to act on grounds generally

applicable to the Class, thereby making appropriate final injunctive relief with respect to the Class as a whole.

## GENERAL ALLEGATIONS

### Background

20. The term "auction rate security" typically refers to either municipal or corporate debt securities or preferred stocks that pay interest at rates set at periodic "auctions." Auction rate securities generally have long-term maturities, typically 30 years, and in the case of preferred stocks, no maturity date.

21. The market for auction rate securities has grown dramatically and the estimated value of auction rate securities in existence prior to the collapse of the auction market was around $350 billion.

22. Investments in auction rate securities were initially limited to institutional investors, with required minimums of $250,000. In recent years, however, issuers and sellers of auction rate securities have lowered the minimum amount invested to $25,000, in an effort to market auction rate securities as widely as possible to the general public.

23. Auction rate securities were auctioned at par value, so the return on the investment to the investor and the cost of financing to the issuer were determined by the interest rate or dividend yield set through the auction. Generally, the auctions were held every 7, 28, or 35 days, with interest paid at the end of the auction period.

24. The auction itself was of the type commonly referred to as a "Dutch" auction, i.e. one where the price was initially set at a presumably economically unattractive level and then made more attractive to purchasers throughout the course of the auction. For auction rate securities, bids with successively higher rates were offered until all of the securities at the auction were sold.

25. At the end of the auction, the rate at which all of the securities were sold was set uniformly and was called the "clearing rate." The clearing rate was determined by finding the lowest rate bid that was sufficient to cover all of the securities for sale in the auction. If several

bidders had bids at the clearing rate, and there were more bids than shares, the shares were divided pro-rata between the clearing rate bidders. The auction agent, at the end of the auction, allocated the shares per the formula. If all of the current holders decided to hold their securities, then the auction was an "all-hold" auction and the rate was set at a level defined in the prospectus. This rate was generally lower than the market rate.

26.     If there were not enough orders to purchase all the shares being sold at the auction, a failed auction occurred. If the auction failed then none of the current shareholders could sell their shares, no matter what type of order they issued. The maximum rate for many auction rate securities, particularly those invested in corporate debt securities or preferred stocks, was relatively small, however. As a result, if the auction failed, owners unable to sell their shares would receive limited interest on their illiquid investments.

27.     The issuer of each auction rate security selected one or more broker-dealers to underwrite the offerings and to manage the auction process. Investors could only submit orders through the selected broker-dealers. The issuer paid an annualized fee to each broker-dealer engaged to manage an auction.

28.     Investors were required to submit an order to the broker-dealer by a deadline set by the broker-dealer. The broker-dealer generally set this deadline early enough so that it had time to process and analyze the orders before having to submit the orders to the auction agent. This gave the broker-dealer enough time to determine what, if any, orders the broker-dealer wished to place for its own account.

### During the Class Period, Northern Trust Materially Misrepresented the Liquidity of and Risks Associated With Auction Rate Securities and Omitted Material Facts About the Auction Market

29.     Auction rate securities were profitable for Northern Trust. Northern Trust had a significant financial incentive to sell auction rate securities.

30.     In order to perpetuate the auction market and sell as many auction rate securities as possible, Northern Trust represented to investors that auction rate securities were the same as

cash and were highly liquid, safe investments for short-term investing. Northern Trust represented to current and potential Northern Trust clients that the auction rate securities offered by Northern Trust were equivalent to cash or money market funds and were safe, highly liquid short-term investment vehicles and that cash could be received in a matter of days.

31.     Northern Trust failed to disclose to purchasers of auction rate securities material facts about these securities.

32.     Northern Trust failed to disclose that these securities were not cash alternatives, like money market funds, and were instead, complex, long-term financial instruments with 30 year maturity dates, or longer.

### The Market for Auction Rate Securities Collapses

33.     In the summer of 2007, some auctions for auction rate securities backed by sub-prime debt began to fail, but these securities represented only 2-6% of the entire auction rate securities market. In the autumn-winter of 2007, more auctions began to fail. Even though a number of auctions failed in September 2007 and thereafter, Northern Trust continued to encourage investors to purchase auction rate securities and continued to represent to investors that these securities were the same as cash or money markets and were highly liquid, safe investments for short-term investing, without any disclosure of the risks associated with the securities.

34.     On February 13, 2008, 87% of all auctions of auction rate securities failed when all of the major broker-dealers refused to continue to support the auctions.

35.     On February 14, 2008, it was disclosed that UBS, the second largest underwriter of auction rate securities, had decided to no longer support the auction market. Virtually every other major broker-dealer, including Goldman Sachs, Lehman Brothers, Citigroup and Merrill Lynch, among others, also decided around the same time to withdraw their support of the auction market. As a result of the withdrawal of support by all of the major broker-dealers, the market for auction rate securities has collapsed, rendering more than $300 billion of outstanding securities illiquid.

36.     The market for auction rate securities including those sold by Northern Trust was open, well-developed and efficient at all relevant times until the truth emerged and the auction market collapsed. As a result of the materially false and misleading statements and failures to disclose, auction rate securities sold by Northern Trust traded at artificially inflated prices during the Class Period. Plaintiff and other members of the Class purchased and continued to hold auction rate securities sold by Northern Trust relying upon the integrity of the auction market and the market price of those securities, and have been damaged thereby.

37.     During the Class Period, Defendants materially misled the investing public, thereby allowing the auction market to continue and inflating the price of auction rate securities sold by Northern Trust by publicly issuing false and misleading statements and omitting material facts necessary to make Defendants' statements, as set forth herein, not false and misleading. Said statements and omissions were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about the auction rate securities sold by Northern Trust, as alleged herein.

38.     At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused or were a substantial contributing cause of the damages sustained by plaintiff and other members of the Class. As described herein, during the Class Period, Defendants made or caused to be made a series of materially false or misleading statements about the auction rate securities sold by Northern Trust. These material misstatements and omissions had the cause and effect of perpetuating the auction market and creating in that market an unrealistically positive assessment of the auction rate securities sold by Northern Trust, thus causing those securities to be overvalued and artificially inflated at all relevant times. Defendants' materially false and misleading statements during the Class Period resulted in plaintiff and other members of the Class purchasing and continuing to hold auction rate securities sold by Northern Trust at artificially inflated prices, thus causing the damages complained of herein.

## NO SAFE HARBOR

39.     The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this complaint. The statements pleaded herein were not identified as "forward-looking statements" when made. To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of Northern Trust who knew that those statements were false when made.

## LOSS CAUSATION/ECONOMIC LOSS

40.     During the Class Period, as detailed herein, Defendants engaged in a scheme and course of conduct to artificially inflate the price of auction rate securities sold by Northern Trust that operated as a fraud or deceit on purchasers of auction rate securities sold by Northern Trust by misrepresenting the liquidity of and risks associated with such securities. Defendants achieved this by making false and misleading statements about the auction rate securities offered by Northern Trust. When Northern Trust's prior misrepresentations and omissions were disclosed and became apparent to the investing public, the market for auction rate securities collapsed and the auction rate securities offered by Northern Trust became illiquid. As a result of their purchases of auction rate securities from Northern Trust during the Class Period, plaintiff and other members of the Class suffered economic loss, i.e., damages under the federal securities laws in that the securities have substantially less value than that represented by Defendants.

## BASIS OF ALLEGATIONS

41.     Plaintiff has alleged the following based upon the investigation of plaintiff's counsel, and plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## COUNT I

### Violation Of Section 10(b) Of The Exchange Act
### Against All Defendants

42.     Plaintiff repeats and realleges each and every allegation set forth in the paragraphs above as if fully set forth herein. Plaintiff brings this cause of action on behalf of Aimis Art Corporation and the Class.

43.     During the Class Period, Defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including plaintiff and other Class members, as alleged herein; (ii) enable Defendants to sell hundreds of millions of dollars of auction rate securities to current and prospective Northern Trust clients, and on which Northern Trust made substantial commissions; and (iii) cause plaintiff and other members of the Class to purchase auction rate securities from Northern Trust at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, Defendants, jointly and individually (and each of them) took the actions set forth herein.

44.     Defendants (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of auction rate securities from Northern Trust in an effort to maintain artificially high sales and market prices for such securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5. All Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

45.     Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a

continuous course of conduct to conceal adverse material information about the auction rate securities sold by Northern Trust, as specified herein.

46. Defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information, and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors that the auction rate securities sold by Northern Trust were the same as cash and were highly liquid, safe short-term investment vehicles suitable for almost all investors, which included the making of, or the participation in the making of, untrue statements of material facts and omitting to state material facts necessary in order to make the statements made about the auction rate securities in the light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of auction rate securities from Northern Trust during the Class Period.

47. Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts. Defendants' material misrepresentations and/or omissions were done knowingly or deliberately and for the purpose and effect of concealing the truth about the liquidity of and risks associated with auction rate securities from the investing public and supporting the artificially inflated price and market for these securities.

48. As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market and market price of the auction rate securities sold by Northern Trust was artificially inflated during the Class Period. In ignorance of the fact that the market prices of auction rate securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, or upon the integrity of the auction market in which the auction rate securities were traded, and/or on the absence of material adverse information that was known to or recklessly disregarded by Defendants but not disclosed in public statements by Defendants during the Class Period, plaintiff and the other members of the Class acquired and continued to hold auction rate

securities sold by Northern Trust during the Class Period at artificially high prices and were damaged thereby.

49. At the time of said misrepresentations and omissions, plaintiff and other members of the Class were ignorant of their falsity, and believed them to be true. Had plaintiff and the other members of the Class and the marketplace known the truth regarding the liquidity of and risks associated with the auction rate securities sold by Northern Trust, which were not disclosed by Defendants, plaintiff and other members of the Class would not have purchased and continued to hold their auction rate securities, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

50. By virtue of the foregoing, Defendants have violated Section 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

51. As a direct and proximate result of Defendants' wrongful conduct, plaintiff and the other members of the Class suffered damages in connection with their respective purchases of auction rate securities sold by Northern Trust during the Class Period.

## COUNT II

### Violation Of Section 20(a) Of The Exchange Act
### Against Defendant Northern Trust Corporation

52. Plaintiff repeats and realleges each and every allegation set forth in the paragraphs above as if fully set forth herein. Plaintiff brings this cause of action on behalf itself, and the Class.

53. Defendant Northern Trust Corporation acted as a control person of Defendants Northern Trust Securities Inc. and Northern Trust Company within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of its 100% ownership of Northern Trust Securities Inc. and Northern Trust Company, Northern Trust Corporation had the power to influence and control and did influence and control, directly or indirectly, the decision-making by Northern Trust Securities Inc. and Northern Trust Company, including the content and dissemination of the various statements which plaintiff contends are false and misleading.

54. As set forth above, Northern Trust Securities Inc. and Northern Trust Company violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this complaint. By virtue of its position as a controlling person, Northern Trust Corporation is liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Defendants' wrongful conduct, plaintiff and other members of the Class suffered damages in connection with their purchase and retention of auction rate securities from Northern Trust during the Class Period.

## PRAYER FOR RELIEF

**WHEREFORE**, plaintiff prays for relief and judgment, as follows:

A. Determining that this action is a proper class action, designating plaintiff as Lead Plaintiff and certifying plaintiff as a class representative under Rule 23 of the Federal Rules of Civil Procedure and plaintiff's counsel as Lead Counsel;

B. Awarding compensatory damages in favor of plaintiff and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C. Awarding plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees;

D. Awarding extraordinary, equitable and/or injunctive relief as permitted by law, equity and the federal statutory provisions sued hereunder; and

E. Such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Dated: September 17, 2008

                                                **Kaplan Fox & Kilsheimer LLP**

                                                By: _____
                                                Robert N. Kaplan (RK 3100)
                                                Linda P. Nussbaum (LN 9336)
                                                Melinda Rodon (MR 3204)

850 Third Avenue
New York, N.Y. 10022
Telephone: (212) 687-1980
Facsimile: (212) 687-7714
Email: rkaplan@kaplanfox.com
       lnussbaum@kaplanfox.com
       mrodon@kaplanfox.com

Norman E. Siegel
Matthew L. Dameron
**STUEVE SIEGEL HANSON LLP**
460 Nichols Road, Suite 200
Kansas City, MO, 64112
Telephone: (816) 714-7100
Facsimile: (816) 714-7101
Email: siegel@stuevesiegel.com
       dameron@stuevesiegel.com

Michael E. Criden
**Criden & Love, P.A.**
7301 Southwest 57th Court
South Miami, F.L. 33143
Telephone: (305) 357-9000
Facsimile: (305) 357-9050
Email: mcriden@cridenlove.com

Counsel for Plaintiff